IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLENN FRANK,<br><br>                              Plaintiff,<br><br>       v.<br><br>HIGHTOWER HOLDING, LLC,<br>d/b/a LEXINGTON WEALTH<br>MANAGEMENT, and KRISTINE<br>PORCARO, *individually*,<br><br>                              Defendants. | Case No. 25-CV-5258 |

**COMPLAINT FOR AGE DISCRIMINATION, RETALIATION,
INTEFERENCE WITH RIGHTS, AIDING AND ABETTING, FOR
BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING,
DECEPTIVE TRADE PRACTICES,
AND TO ENJOIN ENFORCEMENT OF OVERBROAD RESTRICTIVE
COVENANT AND FOR VIOLATION OF OTHER LAWS**

Plaintiff, Glenn Frank, by and through his attorneys, Aaron B. Maduff of

Barrett & Farahany, and Michaela May of Bennett & Belfort, hereby complains of

Defendants Hightower Holdings, LLC, d/b/a Lexington Wealth Management, and

Kirstine Porcaro, and alleges and states as follows:

**Introduction**

1.      This action arises from the employment and termination of Plaintiff

Glenn Frank ("Mr. Frank" or "Plaintiff") as a financial adviser for Defendant

Hightower Holding, LLC ("Hightower"), d/b/a Lexington Wealth Management

("LWM") due to Mr. Frank's age and in retaliation for his opposition to Hightower's discriminatory efforts to force Plaintiff into a retirement because of his age. Mr. Frank, age 69, has nearly four decades of experience in his field.

2.      Plaintiff enjoys long-standing relationships with his clients predating his employment with Hightower/LWM by years or decades. As set forth herein, over the past several years Hightower continuously "phased" Mr. Frank out of work for his own clients in effort to advance the careers of "younger" advisers to Mr. Frank's detriment and without the consent of Mr. Frank's long-term clients, while using overbroad restrictive covenants as a cudgel to restrict Mr. Frank's mobility and his clients' choices.

3.      On information and belief, Hightower has inferred to Plaintiff's clients that he was retiring when he was not. Later, Hightower unilaterally cut Mr. Frank's hours and pay in half, and heavily restricted his interactions with his long-standing clients, requiring him to defer to younger advisers. Finally, after Mr. Frank brought suit on his discrimination and restrictive-covenant claims, Hightower unlawfully terminated Mr. Frank's employment in retaliation for his opposition to discrimination and because of his age.

4.      Compounding Mr. Frank's injuries, Hightower purports to bind Mr. Frank to overbroad non-solicitation, non-service and confidentiality covenants that do not serve a legitimate business purpose, amount to an unlawful non-competition

restriction, and would restrict Mr. Frank from soliciting or even working with his own clients after a departure for a year after his departure from Hightower. *See* **Exhibit A**. These restrictive covenants are patently unenforceable, and may not lawfully be used to impair Mr. Frank's professional mobility or to limit the choices of his long-standing clients in selecting their financial advisers and planners. Accordingly, Mr. Frank successfully obtained a temporary restraining order in Massachusetts, holding that these restrictions are unenforceable as to Mr. Frank's pre-LWM clients and those Hightower clients with whom he did not interact. *See* **Exhibit B**. Constrained by an order requiring Mr. Frank to litigate his claims against Hightower in Illinois, Mr. Frank now seeks to reinstate that order here, and also seeks a declaratory judgment to the same effect.

## PARTIES

5.      Plaintiff Glenn Frank is a natural person who is a citizen and resident of Bedford, Massachusetts, and who was born in 1955.

6.      Defendant Hightower Holding LLC is a Limited Liability Company organized under the laws of Delaware with a principal place of business located at 200 West Madison, Suite 2500, Chicago, Illinois. Without limitation, Hightower does business as Lexington Wealth Management (hereinafter "LWM") in Lexington, Massachusetts.  When describing actions at the local level, Plaintiff refers to LWM herein, though those decisions are acts of Hightower.

7.      Defendant Kristine (Kris) Porcaro ("Porcaro") is a natural person who resides in New Hampshire and works for Hightower in Massachusetts. Porcaro is a co-founder and President of LWM, and is an employee of Hightower.

## JURISDICTION AND VENUE

8.      Plaintiff filed the charges of discrimination with the Massachusetts Commission Against Discrimination (MCAD) on March 26, 2024 (Charge No. 2024-BEM-01032) and on February 18, 2025 (Charge No. 2025-BEM-00502.) Plaintiff received notices of right to sue on both charges.[1]

9.      By virtue of the co-filing and work share agreement, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission, (EEOC), on February 18, 2025 (Charge No. 16C-2025-01035.)

10.     Plaintiff received a Notice of Right to Sue from the EEOC on that Charge March 28, 2025.

11.     This Complaint is filed within 90 days of the issuance of that Notice of Right to Sue and is therefore timely filed.

---

[1] Generally, under Massachusetts Law, the statute of limitations is three years from the date of the incident so long as a right to sue has been issued by MCAD (or MCAD has had the charge for at least 90 days.)  *See.* Mass Gen. Laws ch. 151B, § 9.

12.    This Court also has subject matter jurisdiction over Plaintiff's claims pursuant to,  28 U.S.C. § 1331, because it involves a claim under the Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.*, a federal question.

13.    This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 13767, because they are so related that they form part of the same case or controversy.

14.    This Court has personal jurisdiction over Hightower because Hightower is a citizen of Illinois, and over Porcaro, without limitation, because Porcaro has agreed to submit to the jurisdiction of this Court.

15.    Pursuant to 28 U.S.C. § 1391, venue properly lies in this judicial district, without limitation, because one or more of the Defendants resides here.

## FACTUAL BACKGROUND

Plaintiff's Background

16.    Mr. Frank has nearly four decades of experience in investing, planning, financial counseling, and investment-related tax strategies.

17.    Mr. Frank holds a Bachelor's of Science degree in Accounting, a Master's degree in Business, and a Master's degree in Taxation.

18.    Mr. Frank is a PFS (personal financial specialist) and, for many years, was a CFP (certified financial planner) and CPA (certified public accountant).

19.     Mr. Frank regularly writes articles in his field and has written a book, *Your Encore: How to Balance Time, Money and Happiness During Retirement*.

20.     Mr. Frank's articles, "How to Create a Portfolio to Last a Lifetime" and "Transform Your Investment Strategy: From FOMO to FORO" were published in *The Street* in October 2023 and 2024, respectively.

21.     Mr. Frank enjoys a high profile in the local and national financial- and retirement-planning communities, including through his national podcasts and educational seminars.

22.     Mr. Frank was the founding director of a master's program in financial planning in 1996.

23.     Since 1996, Mr. Frank has taught advanced investment courses to financial advisers and the general public.

24.     For decades and into the present, Mr. Frank has striven to serve his clients holistically, comprehensively, and (most importantly) objectively.

25.      To effectuate these goals, Mr. Frank integrates investments, taxes, planning and client emotions into the ongoing decisions needed to accomplish his clients' personal goals.  It is for these reasons that his clients follow him.

Frank's Employment with Lexington Wealth Management

26.     In 2010, LWM hired Mr. Frank, initially in the position of Director of Investment Tax Strategy.

27.     From the date of his hire by LWM/Hightower to the present, Mr. Frank has lived and worked in Massachusetts.

28.     At or about the time of his hire, Mr. Frank served approximately fifty (50) of his own clients, whom he procured, developed relationships with, and who followed him to LWM.

29.     Also at or about the time of his hire, Mr. Frank was appointed to LWM's Investment Committee.

30.     Generally, a registered investment advisory firm has an Investment Committee, which determines the overall investment strategy and policy; set asset-allocation targets; oversee portfolio performance; monitor risk levels, and perform oversight of managers.

31.     As Director of Investment Tax Strategy and in subsequent positions, Mr. Frank provided direct, senior-level client service, and led educational initiatives for LWM staff and clients.

32.     At the start of 2024, Mr. Frank served approximately 25 clients, approximately 21 to 23 of whom were his clients when he joined LWM in 2010, and approximately 20 of whom reside in Massachusetts.

33.     The other 2-4 clients were referred by one of the original 23 clients.

34.     Mr. Frank's clients' portfolios now total more than $150 million.

35.     Additionally, another fifteen (15) or so clients that Mr. Frank brought to LWM in or about 2010 when he left Wells Fargo remain clients of Hightower/LWM.

Mr. Frank's Client Relationships

36.     Over the years, Mr. Frank's duties towards his clients included oversight and management of all levels of client service.

37.     Without limitation, this work included ongoing, direct contact with clients; initiating and attending all non-clerical client meetings; ongoing client-service team meetings; serving as a client advocate as a senior member of LWM's Investment Committee; conducting outside research for atypical client needs; and higher-level income and estate-tax planning.

38.     Because of the relationships Mr. Frank fostered with his clients, his clients followed him from various investment firms over the years.

39.     Numerous of Mr. Frank's clients have openly said that they stayed with LWM through the years specifically because of Mr. Frank's involvement in and attention to their accounts.

40.     Without limitation, examples of Mr. Frank's long-term clients include:

a. "**Client No 1**,"[2] a widow, whom Mr. Frank first began advising in 1999, prior to joining LWM, whose portfolio currently approximates $900,000 and who resides in both Massachusetts and Florida;

b. "**Client No. 2**," a couple, whom Mr. Frank first began advising in 1986, prior to joining LWM, whose portfolio currently totals approximately $8 million, and who reside in Massachusetts;

c. "**Client No. 3**," a couple, whom Mr. Frank first began advising in 2007, prior to joining LWM, whose portfolio currently totals approximately $3 million, and who reside in Massachusetts;

d. "**Client No. 4**," a family, whom Mr. Frank first began advising in 1987, prior to joining LWM, whose portfolio currently totals approximately $6 million and who reside in Massachusetts;

e. "**Client No 5**," a widow, whom Mr. Frank first began advising in 1998, prior to joining LWM, whose portfolio currently approximates $1.6 million and who resides in Massachusetts;

f. "**Client No 6**," a widow, referred by "Client No 5" whom Mr. Frank first began advising in 2021, whose portfolio currently approximates $20 million and who resides in Massachusetts;

---

[2]     Plaintiff's clients are identified by pseudonyms to protect their privacy.

g. "**Client No 7**," a recent widow, whom Mr. Frank first began advising in 2006, prior to joining LWM, whose portfolio currently approximates $4 million and who resides in Massachusetts, and

h. "**Client No 8**," a family, whom Mr. Frank first began advising in 1988, prior to joining LWM, whose portfolio currently approximates $5 million and who reside in Massachusetts.

41.    Over the years and into the present day, Mr. Frank's clients have reached out to Mr. Frank directly thanking him for his work on their portfolios as well as for his financial and tax-saving strategies.

42.    Clients have told Mr. Frank that he has been crucial to their financial wellbeing, especially at critical junctures in their lives (e.g., upon the loss of a loved one).

43.    Mr. Frank successfully navigated tumultuous situations with his clients, including but not limited to the Internet bubble of 2000-2002, the attack on the World Trade Center on September 11, 2001, the 2008 financial crisis, and COVID in March 2020.

44.    Again and again, Mr. Frank's clients have remarked, "I do not care whose name is on the door as long as Glenn is behind it," or words to that effect.

45.    To wit, when Mr. Frank left Wells Fargo in 2010 to join LWM, the vast majority of his clients followed him.

<u>Changes are made behind Plaintiff's back because of his age</u>

46.     In or about 2016, Mr. Frank became a 20-hour-per-week employee but his title and responsibilities, including toward his clients, remained essentially the same.

47.     In any event, Mr. Frank typically worked far more than 20 hours per week for LWM's and his clients' benefit.

48.     At some point over the past several years, LWM unilaterally changed Mr. Frank's role on client services teams to "member emeritus" without consulting him or his clients as to what that "internal" title conveyed.

49.     This change had the result of removing Mr. Frank from having "final say" on his accounts, again without notice to him or his clients.

50.     The "final say" went to younger advisors—i.e. more junior advisers in their 30s, 40s or 50s.

51.     Mr. Frank's duties with respect to the clients remained the same, at least to the extent that Mr. Frank was aware.

52.     Mr. Frank did not learn of these changes until years later, in or about late 2021.

Hightower acquires Lexington Wealth Management

53.     In 2019, the Financial Planning Association of Massachusetts named Mr. Frank its Planner of the Year.

54.     In 2019, Hightower acquired LWM.

55.     Mr. Frank continued to work at Hightower's/LWM's office in Lexington, Massachusetts.

56.     Despite a change of job title to Director of Education at about the time of the acquisition, Mr. Frank continued to provide investment and financial planning services to his own clients, including those identified in Paragraph 40, *supra*.

57.     Mr. Frank's job duties for Hightower continued to include, the preparation and delivery of financial education workshops to LWM's staff on a wide variety of topics relevant to financial, estate planning, investments and taxation.

Defendants remove Plaintiff from the Investment Committee because of his age

58.     In or about 2021, Defendants removed Mr. Frank from the Investment Committee altogether, without telling him (or his clients) for seven months or more.

59.     For Mr. Frank's clients, his inclusion (or omission) from the Investment Committee was important because they wanted to ensure that Mr. Frank's views informed LWM's overall investment strategies, and in turn, the management of their own investments.

60.     In or about November 2021, Mr. Frank learned that he had been taken off the Investment Committee when he was not included as a member in a marketing brochure.

61.     Mr. Frank asked what happened.

62.     In response, Ms. Porcaro told Plaintiff that Defendants' reason for removing Mr. Frank from the Investment Committee was to make room for "younger" advisers on the committee and give them more experience.

63.     At the time, and through Plaintiff's separation, Mr. Frank reported to Mr. James (Jim) Hastings, who is LWM's Director of Advisor Services.

64.     Mr. Frank attempted to engage LWM, including Ms. Porcaro about his role and inclusion on the Investment Committee on numerous occasions.

65.     On information and belief, at some point in or around September 2023, Defendants unilaterally removed Mr. Frank from the Investment Committee, yet again and without notice to him or his clients. (It appears that Defendants had a pattern of repeatedly removing -- to make room for younger people -- and reinstating and Mr. Frank from the Committee behind his back.)

66.     Mr. Frank learned of his removal when reading the Investment Committee meeting notes in which he was no longer listed him as a member.

67. LWM CEO and Co-Founder Michael Tucci ("Mr. Tucci"), Ms. Porcaro and Mr. Hastings, had several discussions (as recently as June 6, 2023) during which Mr. Frank's age was raised.

68. Specifically, Mr. Tucci and Ms. Porcaro discussed how he was (and they were) getting older, the purported need (according to Mr. Tucci and Ms. Porcaro) to turn over the reins to younger successors so the firm could grow, and how Hightower partners may be required to retire at a certain age.

69. Mr. Frank was told that if he did not take a role subordinate to that of the younger advisors, he would be removed from his clients' service teams completely.

70. On information and belief, over the past several years, LWM leadership has unilaterally and repeatedly told staff and Mr. Frank's clients that Mr. Frank would be "phasing out" (i.e. retiring).

71. Mr. Frank had no plans to retire, and reiterated this fact to LWM leadership, including to Mr. Tucci, Ms. Porcaro and Mr. Hastings.

72. Indeed, on information and belief, Hightower unilaterally provided various clients of Mr. Frank inaccurate information, including that Mr. Frank was not available, was spending a lot of time in Florida and elsewhere. In fact, Mr. Frank was available to work on their accounts.

14

73.     Apparently, Hightower removed Mr. Frank from many of his own accounts over the years and gave those accounts to younger advisers—to wit, Kerry Luria, Mr. Jim Hastings, Jason Hastings, and Aaron Derderian (approximately ages 55, 45, 43 and 33, respectively).

## Hightower demotes Plaintiff and moves his clients to younger advisors

74.     In late fall of 2023, Hightower informed Mr. Frank that, effective January 1, 2024, Hightower would cut his compensation in half.

75.     On information and belief, all decisions within LWM concerning hiring, firing, promotion, demotion, change in job title, compensation, and who are deemed "lead advisers" were made by or in substantial consultation with Ms. Porcaro.

76.     In other words, on information and belief, Ms. Porcaro made or materially contributed to Hightower's decisions to demote Mr. Frank, to cut his compensation in half, and to reassign his clients to younger LWM "lead advisers," all in an effort to force his retirement and unlawfully co-opt the good will of his base of long-term, largely Massachusetts-based clients without their knowledge or consent.

77.     Initially, Ms. Porcaro and Mr. Tucci proposed cutting Mr. Frank's base salary in half and adding incentive-based new compensation that was tied to objectively unrealistic and unattainable goals for client growth.

78.     Hightower later told Mr. Frank that, instead, the company would reduce his schedule from 20 hours to 10 hours per week to support cutting his salary in half.

79.     Defendants also told Mr. Frank that Hightower wanted him to use about half of his working time to contact various professionals in an effort to increase accounts.

80.     Furthermore Mr. Frank was to remain expert enough in ten (10) highly technical areas to continue to train LWM staff.

81.     In a further effort to move his clients' portfolios to younger advisers, Hightower removed serving Mr. Frank's clients from his job responsibilities.

82.     On information and belief, no other employees of LWM had their salaries reduced.

83.     Further, and despite his decades of experience, Mr. Frank was no longer permitted to contact his own clients directly about their portfolio without advanced approval of the junior advisors on the client service team.

84.     Hightower also informed Mr. Frank that it will be up to the younger, now the purported "lead advisers" to determine whether, and to what extent, Mr. Frank will be included in communications with his long-standing clients.

85.     Hightower was attempting to push Mr. Frank out of his job because of his age—while simultaneously constraining his client base to remain with Hightower rather than follow the financial adviser they have trusted for decades.

Plaintiff complains of age discrimination

86.     On or about December 22, 2023, Mr. Frank complained of age discrimination in correspondence from his legal counsel to Hightower's Chief Human Resources Officer, Sarah Musante.

87.     That letter set forth concerns that Mr. Frank's forced demotion was illegal age discrimination.

88.     On December 29, 2023—just one week later—counsel for Hightower responded that the demotion was not discrimination.

89.     On information and belief, Hightower conducted little or no investigation into Plaintiff's allegations of age discrimination—far less than the neutral, good-faith, thorough investigation required under Massachusetts law.

90.     Hightower did not even discuss his discrimination complaints with Mr. Frank until many months later and, even then, only under pressure from Mr. Frank's legal counsel.

91.     Mr. Frank's forced demotion and 50% pay cut took effect on January 2, 2024, which brought him under $75,000.

<u>Hightower suspends Plaintiff in retaliation for official complaints of discrimination</u>

92.    In the aftermath of his demotion, Mr. Frank attempted to engage Hightower concerning the mistreatment he continues to experience because of his age, including and without limitation, by informing Ms. Porcaro and Mr. Tucci that he was planning to file a complaint with the Massachusetts Commission Against Discrimination (MCAD).

93.    On March 25, 2024, Mr. Frank informed Ms. Porcaro and Mr. Tucci by email sent at 10:21 a.m. of his intent to file an MCAD charge complaining of age discrimination.

94.    In response, Ms. Porcaro wrote in an email to Mr. Frank, copying Mr. Tucci, at 10:23 a.m. stating, "Very sad you've decide (sic) to end your relationship with us this way.  I'm dissappoint (sic)."

95.    Clearly, Ms. Porcaro saw Mr. Frank's pursuit of his age discrimination claims as the last straw requiring termination of his employment with Hightower.

96.    Mr. Frank promptly responded to both Ms. Porcaro and Mr. Tucci that he was not leaving his employment with Hightower.

97.    Later that same day, Hightower informed Mr. Frank that he was being suspended from his employment, purportedly because of an email that Mr. Frank sent to clients.

98. Mr. Frank was suspended with pay for approximately six (6) weeks, during which time Mr. Frank's access to his clients and LWM's systems, including email, was cut.

99. Hightower claimed that it conducted an "investigation" into its alleged concerns during Mr. Frank's leave.

100. On information and belief, Hightower told Mr. Frank's clients that Mr. Frank was "on leave" and did not state that this leave was Hightower's decision, thereby implying once again that Mr. Frank was "phasing out," or that he did not care about the clients enough to attend meetings, or that he was unwell. None of this was true.

101. In some instances while on leave, Mr. Frank was copied by email on invitations to client meetings, but could not receive them because he did not have email access, resulting in clients being led to believe that Mr. Frank had been invited to their meetings but had not shown up or did not care about them, neither of which was true.

102. Mr. Frank observed that the younger advisors to whom Hightower reassigned his clients began to copy Mr. Frank even less often on client emails.


The Restrictive Covenants Battle

103.   Facing mounting age discrimination, a loss of pay, and forcible removal from his long-term clients, Mr. Frank felt constrained to search for new employment, for his own professional and financial well-being and, should his clients wish to remain with him, to provide the individualized financial advising services that he believes that Hightower is not providing in favor of a "one-size-fits-all" approach that Mr. Frank believes is not in the best interest of his clients.

104.   However, Mr. Frank risked costly, extended litigation with Hightower should he leave the Company and, should his clients wish to go with him, to take them.

105.   Hightower purports to bind Mr. Frank to a contract titled, "Standard Protective Agreement" ("SPA"), a true copy of which is appended hereto as **Exhibit A**.

106.   Paragraph 4 of the SPA states in relevant part:

**4. Non-Solicitation and Non-Interference.** During Employee's employment with the Company and for a period of twelve (12) months immediately following the voluntary or involuntary termination of Employee's employment for any reason (the "Restricted Period"), Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any other Person, except on behalf of the Company in furtherance of Employee's proper duties to the Company:

a. contact, request, solicit or encourage, or direct any Person to contact, request, solicit or encourage any of the Company's brokers, financial advisors, employees, independent contractors, recruits, Customers or Prospective Customers (the "Protected Business Contacts"), for the purpose of (i) providing said Protected Business Contacts any products, services and/or advice that are the same as or similar to any of the products, services and/or

advice provided by the Company, (ii) entering into any agreement, engagement or opportunity to provide any such products, services and/or advice to said Protected Business Contacts, and/or (iii) accepting or receiving any transfer or assets or accounts of said Protected Business Contacts; or

. . .

c. otherwise interfere with, reduce, or harm the Company's relationships with such Protected Business Contacts or Protected Personnel.

107.    Paragraph 8(a) of the SPA defines "Customer" as "any Person that, within the last twelve (12) months (or, if Employee's employment with the Company has terminated, within the twelve (12) month period immediately preceding such termination of employment), received any type of investment management, investment advisory, brokerage or other product, service and/or advice from the Company or any of its employees."

108.    Paragraph 8(e) of the SPA defines "Prospective Customer" as any Person that, within the last twelve (12) months (or, if the Employee's employment with the Company has ended, within the twelve (12) month period immediately preceding termination of such employment), was directly or indirectly contacted or solicited by the Company or who directly or indirectly contacted the Company, in either case for the purpose of having such Person become a customer of the Company."

109.    Thus, without limitation and fairly construed, if Mr. Frank leaves LWM, the SPA purports to restrict Mr. Frank from soliciting business from his own

clients (including clients with whom he worked before working for Hightower/LWM) or from accepting business from them should they seek to retain him to manage or advise on their portfolios and financial plans.

110.   Paragraph 5 of the SPA broadly restricts use, possession and ownership of customer lists and contact information, including of individuals whose adviser-client relationship with Mr. Frank predated his employment with Hightower/LWM.

111.   More specifically, Paragraph 5 would require Mr. Frank to return all and destroy all client lists and contact information, including for clients he served before he worked for Hightower/LWM.

112.   Thus, through the SPA, Hightower would unlawfully appropriate information within Mr. Frank's possession and, in some instances memory, for decades as its own.

113.   At no time has Mr. Frank been a shareholder, owner or partner of LWM or Hightower, nor did LWM or Hightower acquire any business to which Mr. Frank was then a shareholder, owner or partner.

114.   The purported restrictions in the SPA limit Mr. Frank's mobility between jobs because, despite having developed healthy client relationships over several decades, he cannot bring clients to a new employer in his field, without risk of litigation to himself and a new employer, thereby making it substantially more difficult to attain new employment.

115. Indeed, Hightower aggressively seeks to enforce its restrictive covenants as to departing financial advisers nationwide, even in the face of repeated court orders in various states finding those agreements overbroad and unenforceable including *inter alia*:

a. *Hightower Holding, LLC v. Kedir*, No. 23 CV 15616, 2024 U.S. Dist. LEXIS 121901, at *1 (N.D. Ill. July 11, 2024);

b. *Holding v. Gibson,* No. 2022-0086-LWW, 2023 Del. Ch. LEXIS 245, at *4 (Ch. Feb. 9, 2023);

c. *Frank v. Hightower Holding*, LLC, No. 2484CV02039, 2024 Mass. Super. LEXIS 97, at *1 (Aug. 29, 2024);[3] and

d. Others in confidential arbitrations.

116. On information and belief, Hightower's notorious, aggressive efforts to enforce its restrictive covenants, with the knowledge that they are overbroad on their face, has a chilling effect on Hightower employees who wish to secure new employment and companies who would consider hiring them, as both must fear costly, time-consuming, and potentially out-of-state litigation, however meritless.

117. On information and belief, through these means, Hightower also unlawfully and deceitfully restricts the choices of Massachusetts consumers.

---

[3] A prior iteration of this case.

Hightower reinstates Mr. Frank from his leave to change his job to take his clients

118.   Hightower reinstated Mr. Frank from his "leave," effective May 7, 2024, with a new job description that explicitly required him to transition his clients to other (younger) advisers.

119.   As a result, Mr. Frank's group of clients he served rapidly declined as a direct (and intended) result of Defendants' actions.

120.   On information and belief, the clients have been largely unaware of the cause, i.e. that Hightower was pushing Mr. Frank out in favor of younger advisers.

121.   Throughout most of 2024, Mr. Frank's salary remained in half, with Hightower continuing to restrict and impede his interactions with his own clients.

122.   Hightower also significantly restricted Mr. Frank's "outside employment," thereby severely limiting his ability to compensate for his lost income.

123.   Hightower has remained steadfast in Defendants' position that the SPA, including the restrictive covenants, is enforceable as to Mr. Frank.

124.   Under Plaintiff's new job description, just one (1) hour per week was allotted to Mr. Frank's meetings with his clients.

Plaintiff is excluded from managing his clients

125.   It was also up to the younger advisors to decide whether to invite Mr. Frank to meetings.

126.   Mr. Frank told the advisors that he still wants to attend meetings with his long-term clients as well as being copied on emails with them.

127.   Mr. Frank wished to ensure that his clients are advised of the risks that he believes are associated with LWM's strategies, including its use of "one size fits all" investment models that Mr. Frank believes do not adequately consider current market conditions, client patience levels, equity valuation risks, and outside forecasts.

128.   Mr. Frank was deeply concerned not only for his career, but for the well-being of his long-term clients.

Prior Litigation

129.   After exhausting his administrative remedies, Plaintiff filed suit in the Suffolk Superior Court in Massachusetts on August 1, 2024.

130.   On August 29, 2024, the Suffolk Superior Court granted Mr. Frank's motion for a temporary restraining order enjoining enforcement of Hightower's non-solicitation restrictions as to Mr. Frank's pre-LWM clients and those Hightower clients with whom Mr. Frank did not interact. *See* **Exhibit B**.

131.   Thereafter, Hightower moved to dismiss, without limitation, on the basis of forum-selection language contained in the PIPA.

132.   The Suffolk Superior Court granted Hightower's motion to dismiss on November 21, 2024, holding that Mr. Frank must litigate his claims in Illinois, so long as the individual defendants (including Ms. Porcaro) waived any objections to personal jurisdiction there.

133.   Ms. Porcaro executed a stipulation waiving objections to personal jurisdiction in Chicago, Illinois.

134.   On December 13, 2024, the Suffolk Superior Court dismissed Mr. Frank's suit in accordance with the Court's order on the motion to dismiss.


Hightower terminates Plaintiff due to his age and/or in retaliation for his complaints of age discrimination

135.   Three days later, on December 16, 2024, Mr. Frank and Mr. Hastings met for Mr. Frank's performance review.

136.   Mr. Frank's performance review was written and signed by Mr. Hastings, who was aware of Mr. Frank's lawsuit alleging age discrimination and retaliation.

137.   Thereafter, on or about December 19, 2024, Hightower abruptly terminated Mr. Frank's employment in a meeting in which Ms. Porcaro and Mr. Hastings were present.

26

138. On information and belief, Ms. Porcaro, contributed to LWM's decision to terminate Mr. Frank's employment.

139. According to Mr. Hastings, the Company's reason was that Mr. Frank had received a poor annual performance rating—for the first time in his career.

140. According to LWM, Mr. Frank's "culture scores" (which presumably would have included "anonymous" feedback from Ms. Porcaro) were poor.

141. Prior to bringing suit against Hightower, Mr. Frank had the highest, or some of the highest, "culture scores" at LWM.

142. Further, prior to Mr. Frank's (age-based) demotion, Mr. Frank was not expected to bring in new clients.

143. Defendants' claims about Mr. Frank's performance sharply contrasted years of positive reviews, were false, and are a pretext for age discrimination and retaliation.

Hightower's Interference with Plaintiff's Future employment

144. Hightower has developed a reputation for bullying prospective employers of its former employees with costly litigation.

145. Plaintiff has had great difficulty finding other employment.

146. On information and belief, Hightower's litigious reputation and its position on the SPA, has discouraged prospective employers from considering and hiring Mr. Frank.

## COUNT I

### DEMAND FOR DECLARATORY JUDGMENT
### THAT THE RESTRICTIVE COVENANTS ARE NULL AND VOID
### (HIGHTOWER)

147. Plaintiff restates and incorporates paragraphs 1 through 57 and 74 through 85, 91, 103 through 134, 137 and 138, and 144 through 146, as paragraph 147 of this Count I.

148. There is an actual controversy between Plaintiff and Hightower regarding whether the non-solicitation, non-service and confidentiality provisions of the SPA that would prohibit Plaintiff from soliciting or accepting business from his own clients, or retaining their names or contact information, following a separation from Hightower are enforceable.

149. Having been terminated from his employment, Mr. Frank must secure new employment in his field; however, the threat of litigation from Hightower is a serious impediment to Plaintiff securing new employment or to Plaintiff starting his own venture, in which he would serve those of his long-standing clients who chose to secure his services.

150. More specifically, new prospective employers expressed their wariness of hiring Plaintiff because they fear litigation from Hightower over his restrictive covenants, as even unmeritorious litigation is costly.

151. Mr. Frank believes that these long-term clients should be advised on their options, and applicable risks and benefits, rather than be constrained by Hightower's models.

152. Mr. Frank does not intend to employ or retain Hightower's investment models in his next position or venture.

153. Mr. Frank seeks to provide complete, objective information to his clients and then work with them to tailor their portfolios and financial plans in a holistic, comprehensive and integrated fashion, in accordance with his approach to wealth management.

154. Other provisions in the SPA are overbroad, against public policy, and may not be enforced.

155. For example, Paragraph 3(a) of the SPA may be construed as permitting Hightower to appropriate information possessed by Mr. Frank *before* LWM/Hightower hired him (e.g., client lists and contact information) as its own "Confidential Information" (as defend in the SPA), subject to the non-disclosure, use and ownership restrictions in the SPA.

156.   Likewise, Paragraph 6, governing "Non-Disparagement," is grossly overbroad and contravenes public policy, particularly to the extent that it would interfere with Mr. Frank's fiduciary obligations to his current (or future) clients to provide truthful, good-faith investment guidance.

157.   Plaintiff has standing to assert his claim and seek declaratory relief.

158.   As a result of the actions of Hightower, Plaintiff has been harmed.

WHEREFORE, Plaintiff, Glenn Frank, respectfully requests that this Honorable Court reinstate the order of the Massachusetts superior court preliminarily enjoining Hightower from enforcing the SPA as to Plaintiff's existing clients and those Hightower clients with whom he did not interact while working for the company, judgement declaring that the restrictive covenants that Hightower had him sign are null and void, and for such other and further relief this Court deems just and equitable.

## COUNT II

## DEMAND FOR RELIEF FOR AGE DISCRIMINATION
## IN VIOLATION OF MASS. GEN. LAWS CH. 151B § 4(1B)
## (HIGHTOWER)

159.   Plaintiff restates and incorporates paragraphs 1 through 102, 118 through 146, as paragraph 159 of this Count II.

160.   Plaintiff exhausted his administrative remedies under Massachusetts General Laws (G.L.) c. 151B, without limitation, by filing two, timely complaints with the MCAD and the U.S. Equal Employment Opportunity Commission ("EEOC").

161.   More than ninety (90) days have passed since Plaintiff filed his first MCAD charge.

162.   Prior to the filing of this action, the MCAD authorized Plaintiff to file suit on his second MCAD charge.

163.   As set forth herein, Hightower has discriminated against Mr. Frank due to his age, without limitation, in a continuing violation of G.L. c. 151B, § 4(1B) by removing his accounts, altering and removing his job responsibilities, reducing his compensation, subjecting him to a hostile work environment because of his age, terminating his employment, and otherwise altering the terms and conditions of Mr. Frank's employment.

164.   As set forth herein, Hightower also failed to conduct the timely, thorough, neutral and good-faith investigation into Mr. Frank's complaint(s) of age discrimination, in further violation of G.L. c. 151B, § 4(1B).

WHEREFORE, Plaintiff, Glenn Frank, respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Hightower, and award him back pay, front pay, emotional distress damages, liquidated damages,

attorneys' fees, costs and statutory interest, and such other and further relief as this Court deems just and equitable.

## COUNT III

## DEMAND FOR RELIEF FOR AGE DISCRIMINATION IN VIOLATION OF THE ADEA, 29 U.S.C. § 623(a) (HIGHTOWER)

165.   Plaintiff restates and incorporates paragraphs 1 through 102, 118 through 146, as paragraph 165 of this Count III.

166.   As set forth herein, Hightower discriminated against Mr. Frank due to his age, without limitation, by demoting him, reducing and revising his job responsibilities, interfering with his client relationships, and ultimately, by terminating his employment, all in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a).

167.   Prior to filing suit, Plaintiff exhausted his administrative remedies under the ADEA.

WHEREFORE, Plaintiff, Glenn Frank, respectfully requests that this Honorable Court enter judgement in his favor and against Defendant Hightower, and award him lost wages, liquidated damages, attorneys fees and costs, and such other and further relief as this Court deems just and equitable.

## COUNT IV

## DEMAND FOR RELIEF FOR RETALIATION
## IN VIOLATION OF MASS. GEN. LAWS CH. 151B § 4(4)
## (ALL DEFENDANTS)

168.   Plaintiff restates and incorporates paragraphs 1 through 102, 118 through 146, as paragraph 168 of this Count IV.

169.   Plaintiff engaged in conduct protected by G.L. c. 151B, including but not limited to by making internal complaints of age discrimination, including to HR and through his legal counsel; filing a complaint with the MCAD; and notifying Defendants that he had filed an MCAD complaint against them and Hightower; and pursuing his G.L. c. 151B claims in Superior Court.

170.   As set forth herein, Defendants have unlawfully retaliated against Plaintiff for his complaints under and opposition to conduct violating G.L. c. 151B, § 4, including but not limited to by suspending Mr. Frank from his employment, further restricting his contacts and limiting his role with respect to his clients, and ultimately, by terminating his employment.

171.   The foregoing conduct violated G.L. c. 151B, § 4(4).

WHEREFORE, Plaintiff, Glenn Frank, respectfully requests that this Honorable Court enter judgment in his favor against Defendants Hightower and Porcaro and award him back pay, front pay, emotional distress damages, attorneys' fees, costs and statutory interest, jointly and severally, punitive damages against

Porcaro and Hightower individually, and such other and further relief as this Court deems just and equitable.

## COUNT V

### DEMAND FOR RELIEF FOR RETALIATION IN VIOLATION OF THE ADEA, 29 U.S.C. § 623(c) (HIGHTOWER)

172.  Plaintiff restates and incorporates paragraphs 1 through 102, 118 through 146, as paragraph 172 of this Count V.

173.  Plaintiff engaged in conduct protected by the ADEA, including but not limited to by making internal complaints of age discrimination, including to HR through his legal counsel; filing a complaint with the EEOC; notifying Defendants that he had filed an EEOC complaint, and by otherwise pursuing his age-discrimination claims in litigation.

174.  As set forth herein, Defendants have unlawfully retaliated against Plaintiff for his complaints under and opposition to conduct violating the ADEA, including but not limited to by suspending Mr. Frank from his employment, further restricting his contacts and limiting his role with respect to his clients, and ultimately, by terminating his employment.

175.  The foregoing conduct violated the ADEA, 29 U.S.C. § 629(c).

WHEREFORE, Plaintiff, Glenn Frank, respectfully requests that this Honorable Court enter judgement in his favor and against Defendant Hightower, and

award him lost wages, liquidated damages, attorneys fees and costs, and such other and further relief as this Court deems just and equitable.

## COUNT VI

## DEMAND FOR RELIEF FOR INTERFERENCE WITH RIGHTS IN VIOLATION OF MASS. GEN. LAWS CH. 151B, § 4(4A) (KRISTINE PORCARO)

176.   Plaintiff restates and incorporates paragraphs 1 through 102, 118 through 146,  as paragraph 176 of this Count VI.

177.   As set forth herein, Ms. Porcaro interfered with Mr. Frank's rights under G.L. c. 151B, including without limitation, by attempting to force him into "retirement" and otherwise negatively affecting the terms and conditions of his employment all because of his age and because of his opposition to the discrimination he has experienced, in violation of G.L. c. 151B, § 4(4A).

WHEREFORE, Plaintiff, Frank Glenn, respectfully requests that this Court enter judgment in his favor and against Kristine Porcaro and award him back pay, front pay, emotional distress damages, punitive or liquidated damages, attorneys' fees, costs and statutory interest, and such other and further relief as this Court deems just and equitable.

35

## COUNT VII

## DEMAND FOR RELIEF FOR AIDING AND ABETTING
## IN VIOLATION OF MASS. GEN. LAWS CH. 151B, § 4(5)
## (KRISTINE PORCARO)

178.  Plaintiff restates and incorporates paragraphs 1 through 102, 118 through 146, as paragraph 178 of this Count VII.

179.  As set forth herein, Ms. Porcaro aided, abetted, incited, compelled and/or coerced the violations of G.L. c. 151B, set forth herein, in violation of  G.L. c. 151B, § 4(5).

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Kristine Porcaro and award him and back pay, front pay, emotional distress damages, punitive or liquidated damages, attorneys' fees, costs and statutory interest, and such other and further relief as this Court deems just and equitable.

## COUNT VIII
## DEMAND FOR RELIEF FOR VIOLATIONS
## OF THE MASSACHUSETTS WAGE ACT,
## MASS. GEN. LAWS c. 148, § 149
## (HIGHTOWER)

180.  Plaintiff restates and incorporates paragraphs 1 through 15, 26, 53 through 57, and 135 though 137 as paragraph 180 of this Count VIII.

36

181. On December 19, 2025, Hightower terminated Mr. Frank's employment.

182. According to Hightower, Mr. Frank would be paid through December 31, 2025.

183. Mr. Frank's payroll records show that Hightower paid him on December 31, 2025; however, that paycheck did not include his salary through his termination date of December 31, 2025.

184. Thereafter, Hightower admitted to only having paid his salary through December 19, 2025, notwithstanding the Wage Act's requirement that employees be paid their wages in full through the date of termination.

185. Further, Mr. Frank's paycheck dated December 31, 2025, underpaid Plaintiff for his accrued vacation time.

186. To wit, the paycheck used the wrong "regular rate" to calculate Mr. Frank's unpaid PTO, resulting in underpayment.

187. Because the Wage Act requires an employee to be paid their unused, accrued vacation on or before their termination date this too violated Massachusetts law.

188. Prior to filing suit, Mr. Frank filed a complaint with the Massachusetts Attorney General's Office concerning these violations of the Wage Act.

WHEREFORE, Plaintiff, Glenn Frank, respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Hightower, and award him his unpaid wages (vacation time), treble damages on his late salary and unpaid wages (vacation time), attorneys' fees, costs, and statutory interest.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: May __, 2025

Respectfully Submitted,
Glenn Frank, Plaintiff,
By His Attorneys,

*/s/ Aaron B. Maduff*
Aaron Maduff,
Atty. No. 6226932
aaron@justiceatwork.com
Barrett & Farahany
77 W. Wacker Drive, Suite 4500
Chicago, IL 60601
(312) 276-9000

*/s/ Michaela C. May*
Michaela C. May,
MA Bar No. 676934
mmay@bennettandbelfort.com
Bennett & Belfort, P.C.
24 Thorndike Street, Suite 300
Cambridge MA 02141
(617) 577-8800